Vincent **MIRANDA**, doing business as Walnut Properties, and Pussycat Theatre Hollywood, a California corporation, Plaintiffs,

v.

Cecil **HICKS**, District Attorney of the County of Orange, State of California, et al., Defendants.

Civ. No. 73-2775-F.

United States District Court,
C. D. California.

June 4, 1974.

Supplemental Memorandum Opinion
Sept. 30, 1974.

Fleishman, McDaniel, Brown & Weston by David M. Brown, Hollywood, Cal., for plaintiff.

Cecil Hicks, Dist. Atty., County of Orange, State of California, Michael R. Capizzi, Asst. Dist. Atty., Oretta D. Sears, by John D. Conley, Deputy Dist. Attys., Santa Ana, Cal., Cecil Hicks, Jr., Oretta Sears, Santa Ana, Cal., Kinkle, Rodiger, Graf, Dewberry & Spriggs by Robert P. Long and Holden & Bevins, Anaheim, Cal., by Ronald H. Bevins, City Atty., Buena Park, Cal., for defendants Dudley D. Gourley, Arthur Fontecchio, Richard Hafdahl and Daniel Harrison.

## MEMORANDUM OPINION

Before ELY, Circuit Judge, and EAST, and FERGUSON, District Judges.

PER CURIAM.

The primary issue presented is whether the California obscenity statute as interpreted by the state courts of California meets the constitutional standards mandated by the Supreme Court in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). We hold that it does not.

The facts which give rise to the litigation are as follows:

1. On November 20, 1973, anticipating that the movie "Deep Throat" would be exhibited in the City of Buena Park, in Orange County, California, three

members of the Buena Park Police Department traveled to nearby Los Angeles County and there viewed the film in its entirety.

2. On November 21, 1973, an affidavit and warrant were prepared describing the film, and arrangements made for a judge of a Municipal Court to view the film if it was brought to Buena Park.

3. At 12:30 p. m. on November 23, 1973, the officers, a deputy district attorney and the judge attended a showing of the film at plaintiff's theatre in Buena Park.

4. After viewing about 45 minutes of the film, they retired to the sidewalk in front of the theatre, where the judge was presented with the previously prepared documents.

5. A photographer hired by the theatre began photographing the judge and the officers while they reviewed the papers. One of the officers, acting on orders from the judge, stopped the photographer from taking any more pictures and seized the film in his camera.

6. The search warrant was issued, and the officers seized the movie and posters advertising it. In describing the property to be seized, the warrant also contained the following handwritten addition:

"Money contained in the ticket booth & specifically for a $20.00 bill Ser. # B08574869B."

All the cash in the box office was seized, an amount shown to be $305.00.

7. That afternoon the theatre obtained another copy of the film for exhibition. At 3:00 p. m., the same police officers again viewed the film, and left to get another warrant. The affidavit accompanying the second warrant was an identical copy of the first, but also contains the following handwritten notation:

"Your affiant further states that said film was seized on Nov. 23, 1973 at approx. 1:30 p. m. after being viewed by Judge ——— with the exception of certain portions being ed-

ited different than the first film seized.

Your affiant states that this copy of the film 'Deep Throat' consists of (1) one additional act of sexual intercourse and numerous small changes at different portions of the film."

8. The same Municipal Court judge signed the second warrant without seeing the film again, and the officers returned to the theatre at 4:30 p. m. Another copy of "Deep Throat" was seized, along with some advertising posters.

9. The typed second warrant was also an identical copy of the first, but contained the following handwritten addition in describing the property to be seized: "Money contained in the ticket booth cash drawer." $159.00 in cash was seized from the box office.

10. The theatre obtained yet another copy of "Deep Throat." At 7:45 p. m. the same day, the same officers again returned to the theatre and viewed the film in its entirety. They then contacted the judge, who signed another search warrant at 9:00 p. m. The affidavit in support of the warrant was identical to the first and second, but contained the following handwritten notation:

"Your affiant states that said film was seized on Nov. 23, 1973 at approx. 1:30 p. m. and 4:35 p. m. after being viewed by the Honorable Judge ——— ——— who issued a search warrant.

Your affiant states that the film in question is the same film viewed by Judge ——— with the exception of certain portions of the film being edited differently than the film viewed by the Honorable Judge ——— ———.

Your affiant states that this copy of the film 'Deep Throat' consists of (1) one additional act of sexual intercourse not shown in the copy viewed by Judge ——— and numerous small changes at different portions of the film."

11. The judge decided he wished to view the film again, and returned with

the officers to the theatre at 9:15 p. m. He ordered the officers to execute the warrant, and a third copy of the film was seized.

12. The third warrant was identical to the first and second warrants, but also contained this handwritten notation, describing the property to be seized: "All monies on premises received, in cash drawers or safes at above location." The officers brought a locksmith to the theatre, who opened the business' safe. Money from the cash drawer and the safe totaling $4,082.33 was seized.

13. At 2:30 p. m. the following day, the same officers turned over all the seized items to the judge at his home, and advised him that they believed the movie was going to be shown again.

14. The officers went to the theatre and viewed the film. They returned to the judge's home with another of the identical affidavits, with the same handwritten notation. At 4:00 p. m. the judge signed a search warrant identical to the first three from the day before, with an additional handwritten entry describing the property to be seized: "All monies received, in cash drawers or safes."

15. The warrant was served, and another copy of "Deep Throat", some promotional posters and $197.18 in cash were seized.

16. The theatre ceased exhibition of the movie, closed until November 26, 1974, and thereafter began showing another film.

Plaintiffs in this action are the theatre owner, his property-holding company, and the theatre corporation itself. No criminal complaints are pending against any of them.

Defendants are the District Attorney of the County of Orange, a deputy district attorney, the Chief of Police of the City of Buena Park, and three officers of the Buena Park Police Department.

Plaintiffs filed this lawsuit, basing jurisdiction on 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983. In their complaint they seek the return of the motion picture prints seized by defendants, as well as their cash proceeds. In addition, plaintiffs also seek a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that California Penal Code §§ 311, 311.2 and 311.5 [1] are unconstitutional.

1. § 311. *Definitions*
As used in this chapter:
(a) "Obscene matter" means matter, taken as a whole, the predominant appeal of which to the average person, applying contemporary standards, is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion; and is matter which taken as a whole goes substantially beyond customary limits of candor in description or representation of such matters; and is matter which taken as a whole is utterly without redeeming social importance.
(1) The predominant appeal to prurient interest of the matter is judged with reference to average adults unless it appears from the nature of the matter or the circumstances of its dissemination, distribution or exhibition, that it is designed for clearly defined deviant sexual groups, in which case the predominant appeal of the matter shall be judged with reference to its intended recipient group.
(2) In prosecutions under this chapter, where circumstances of production, presentation, sale, dissemination, distribution, or publicity indicate that matter is being commercially exploited by the defendant for the sake of its prurient appeal, such evidence is probative with respect to the nature of the matter and can justify the conclusion that the matter is utterly without redeeming social importance.
(b) "Matter" means any book, magazine, newspaper or other printed or written material or any picture, drawing, photograph, motion picture, or other pictorial representation or any statue or other figure, or any recording, transcription or mechanical, chemical or electrical reproduction or any other articles, equipment, machines or materials.
(c) "Person" means any individual, partnership, firm, association, corporation or other legal entity.
(d) "Distribute" means to transfer possession of, whether with or without consideration.
(e) "Knowingly" means being aware of the character of the matter.
(f) "Exhibit" means to show.
§ 311.2 *Sending or bringing into state for sale or distribution; printing, exhibiting, distributing or possessing within state*

■ Plaintiffs here have no prosecutions pending against them, and have made no allegations that any are threatened. However, it is clear that they do present a real and actual controversy, and do have standing to challenge the constitutionality of the California obscenity statute, since defendants have seized and continue to hold property of the plaintiffs, property which was seized solely because of alleged violations of the California obscenity statute. The Supreme Court has expressly held that a federal court's jurisdiction under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 is not diminished by any distinction between personal and property rights. See Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

### The Obscenity Statute
### Abstention

The validity of the California obscenity statute (California Penal Code § 311, et seq.) was not determined by the Supreme Court in Miller v. California, *supra*. The Court, in determining a definition of obscenity which falls outside the protection of the First Amendment, permitted judicial construction of obscenity statutes so that even though the statute on its face violated *Miller*, it may fall within *Miller* by judicial construction. Obviously in *Miller* the Supreme Court did not have the benefit of such construction.

However, since *Miller*, the California courts have authoritatively construed the California statute with regard to *Miller*.

In People v. Enskat, 33 Cal.App.3d 900, 109 Cal.Rptr. 433 (1973), hearing denied by the California Supreme Court October 24, 1973, the California Court of Appeal determined that the California statute meets the test of *Miller*.

■ The defendants assert that *Enskat* is now the law in California. Auto Equity Sales Inc. v. Superior Court, 57 Cal.2d 450, 20 Cal.Rptr. 321, 369 P.2d 937 (1962) makes it clear in California that the decision rendered by the California Court of Appeal, Second District, Division Five in *Enskat* is ". . . binding upon all the justice and municipal courts and upon all the superior courts of this state", *id.* at 455, 20 Cal. Rptr. at 324, 369 P.2d at 940. Likewise, although a denial of hearing by the California Supreme Court ". . . is not to be regarded as expressing approval of the propositions of law set forth in the opinion of the District Court of Appeal or as having the same authoritative effect as an earlier decision of [the California Supreme Court], [citations], it does not follow that such a denial is without significance to [that Court's] views," Di Genova v. State Board of Education, 57 Cal.2d 167, 178, 18 Cal.Rptr. 369, 375, 367 P.2d 865, 871 (1962). A denial of hearing ". . . stands, therefore, as a decision of a court of last resort in this state, until and unless disapproved by [the California Supreme Court] or until change of the law by legislative action." Amaya v. Home Ice, Fuel & Supply Co., 59 Cal.2d 295, 306, 29 Cal.Rptr. 33, 39, 379 P.2d 513 (1963), quoting from Cole v. Rush, 45 Cal.2d 345, 289 P.2d 450 (1955). See

(a) Every person who knowingly sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, or in this state possesses, prepares, publishes, or prints, with intent to distribute or to exhibit to others, or who offers to distribute, distributes, or exhibits to others, any obscene matter is guilty of a misdemeanor.

(b) The provisions of this section with respect to the exhibition of, or the possession with intent to exhibit, any obscene matter shall not apply to a motion picture operator or projectionist who is employed

by a person licensed by any city or county and who is acting within the scope of his employment, provided that such operator or projectionist has no financial interest in the place wherein he is so employed.

§ 311.5 *Advertising or promoting sale or distribution; solicitation*

Every person who writes, creates, or solicits the publication or distribution of advertising or other promotional material, or who in any manner promotes, the sale, distribution, or exhibition of matter represented or held out by him to be obscene, is guilty of a misdemeanor.

also Klingebiel v. Lockheed Aircraft Corp., 494 F.2d 345 at p. 346 n. 2 (9th Cir. 1974), citing Stoner v. New York Life Insurance Co., 311 U.S. 464, 61 S. Ct. 336, 85 L.Ed. 284 (1940). Thus, any defense in state court that the statute is defective under the Federal Constitution would be precluded.

In Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), the Supreme Court recognized that principles of equity, comity and federalism necessarily limited a federal court's power to issue an injunction or a declaratory judgment when a state prosecution was pending. In Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), however, the Court made it clear that neither *Younger* nor *Samuels* governed the situation in which there was no pending state prosecution. When, in that instance, the relief sought is declaratory in nature, and jurisdiction is based on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3), the federal courts have been assigned a "paramount role" in protecting constitutional rights. *Steffel,* 415 U.S. at 473, 94 S.Ct. 1209.

■ The situation presents no danger of "duplicative legal proceedings or disruption of the state criminal justice system," *Steffel* at 462, 94 S.Ct. at 1217. The role of the federal court is unaffected, whether the attack is to the statute on its face or as applied, *Steffel* at 473–475, 94 S.Ct. 1209. Here, the California statute is alleged to be facially invalid, but the decision in Miller v. California, *supra,* requires this court to pay due regard to the state judicial interpretation of the statute as well. Finally, the fact that there may be related pending criminal prosecutions against some of the theatre employees does not affect this plaintiff's right to declaratory relief. *Steffel* at 471 n. 19, 94 S.Ct. 1209. No barriers exist to prevent this court from examining the merits of plaintiff's claim.

*Constitutionality*

■ In *Miller,* the standards that state obscenity statutes must meet to comply with the First Amendment are:

(1) whether the average person applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest;

(2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(3) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.

The Court stated, "If a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary." 413 U.S. at 25, 93 S.Ct. at 2615.

■ The issue presented is whether the California statute "as written or construed" specifically defines proscribed sexual conduct. The Court in *Miller* for the first time in its long struggle to define that obscenity which is outside the protection of the First Amendment, adopted a Fifth Amendment fair notice rule. It has long been an established rule of Due Process that no person may be subject to criminal prosecution without "fair notice that his contemplated conduct is forbidden by the statute." United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954); see also Bouie v. City of Columbia, 378 U.S. 347, 350–351, 84 S. Ct. 1697, 12 L.Ed.2d 894 (1964); Lanzetta v. New Jersey, 306 U.S. 451, 59 S. Ct. 618, 83 L.Ed. 888 (1939).

*Miller* states "We are satisfied that these specific prerequisites will provide fair notice to a dealer in such materials that his public and commercial activities may bring prosecution."

■ It is clear that the California statute on its face does not meet the sound test of *Miller,* since it does not specifically define the sexual activity which is prohibited. As it reads, there is no fair notice what California permits or prohibits.

There is dispute among law enforcement officials whether the legislature of California could ever draft a statute which meets the test. The County Counsel for the County of Los Angeles in another case pending before this court has stated:

"The argument of the plaintiff requiring specifically enumerated sexual activity in order to make the obscenity statutes constitutional, must fail because legislatures can't be expected to enumerate and define every possible activity about a perversion known to humans regarding sexual activity. Under the maxim of expression unius est exclusio alterius, plaintiffs' argument would allow certain obscene sexual conduct to be exhibited if it was inadvertently omitted by the Legislation." (Monica Theater, Inc., et al. v. Evelle J. Younger, et al., Case Number 70–2167–ALS. Defendant's Brief, filed November 30, 1973 at p. 2.)

The Court in *Miller* recognized the concern expressed here by Los Angeles' Deputy County Counsel when it stated " ' . . . [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . . ' " 413 U.S. at 27, n. 10, 93 S. Ct. at 2617.

The California Court of Appeal in *Enskat* impliedly conceded that the statute as written does not meet *Miller.* It stated, however, that the statute has been authoritatively construed in the past so as to limit its reach to specifically defined sexual conduct. (At least one federal court has declined to consider the validity of a state obscenity statute solely on the basis of past state cases without the benefit of a post-*Miller* state court analysis. United Artists Corp. v. Harris, 363 F.Supp. 857 (W.D.Okl. 1973).) Given the particularities that the California statute is missing on its face, it may be that such an undertaking would go beyond the pale of judicial construction and cross over into the realm of legislative drafting. For the moment, however, this court need only address itself to the judicial construction put forth in *Enskat.*

In reaching their conclusion the state court cited Zeitlin v. Arnebergh, 59 Cal. 2d 901, 31 Cal.Rptr. 800, 383 P.2d 152 (1968); People v. Noroff, 67 Cal.2d 791, 63 Cal.Rptr. 575, 433 P.2d 479 (1967); People v. Cimber, 271 Cal.App.2d Supp. 867, 76 Cal.Rptr. 382 (1969); and Landau v. Fording, 245 Cal.App.2d 820, 54 Cal.Rptr. 177 (1966). While reference was made in at least two of those cases to sexual acts there involved, none of the state court opinions attempted to delineate standards of obscenity based on specific conduct.

■ The analysis of those cases that emerges in *Enskat* is that: (1) only "hard core pornography" is prohibited; (2) nudity, absent a sexual activity is not obscene; and (3) the material must contain a "graphic description of sexual activity." It is clear that the "fair notice" test of *Miller* is not met.

■ The term "hard core pornography" is no more precise than the term "obscenity." Jacobellis v. Ohio, 378 U.S. 184 at 201, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).

Likewise the mere language "graphic description of sexual activity" does not meet the specificity test. The Court stated "[a]s a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. *That conduct must be specifically defined by the applicable state law,* as written or authoritatively construed." *Miller* at 24, 93 S.Ct. at 2614–2615 (emphasis added). In order to comport with due process, the criminal obscenity statute here must give fair notice of

what conduct is criminally proscribed, United States v. Harriss, *supra,* and the Supreme Court in *Miller,* by outlining its criteria for "obscenity", has authoritatively indicated what a statute, in its language or its judicial construction, must have to be constitutional. *Enskat* and the cases cited therein have not supplied a description of specific sexual conduct "as definitely as if it had been so amended by the legislature", Winters v. New York, 333 U.S. 507, 514, 68 S.Ct. 665, 669, 92 L.Ed. 840 (1948). *Cf.* Beauharnais v. Illinois, 343 U.S. 250, 254, 72 S.Ct. 725, 96 L.Ed. 919 (1952).

In addition to those cases cited by the Court of Appeal in *Enskat,* People v. Sarong Gals, 27 Cal.App.3d 46, 103 Cal. Rptr. 414 (1972); People v. Adler, 25 Cal.App.3d Supp. 24, 101 Cal.Rptr. 726 (1972) and Dixon v. Municipal Court, 267 Cal.App.2d 789, 73 Cal.Rptr. 587 (1968) have been brought to the court's attention as bearing on the construction of § 311. *Sarong Gals* involved a civil suit, an in rem action brought under the Red Light Abatement Act, California Penal Code §§ 11225–11235, and the construction of the statutory term "lewdness", that case is inapplicable to the issues here. *Dixon* involved the lifting of a writ of prohibition and a remand to the municipal court, holding that the fact that there may have been "simulation" of sexual acts did not bar a finding of obscenity as a matter of law. As the Court there noted, however: ". . . [i]n the case before us, we do not have testimony of what was actually done, because prosecution was barred by the writ." 267 Cal.App.2d at 793, 73 Cal.Rptr. at 589. *Adler,* like some of the cases cited in *Enskat,* makes a passing and somewhat vague reference to sexual acts described in the book that was the subject of the action. As with all the cases referred to, however, there is no attempt by the courts of the State of California to formulate a standard of obscenity or a rule of law based upon those specific acts therein mentioned, or upon *any* specific acts.

■ The California Court of Appeal, in deciding *Enskat,* also noted that the statute as presently written imposed "more strict requirements on the prosecution as to the definition of obscenity", because it retains the "utterly without redeeming social value" or *Memoirs* test which the Supreme Court disavowed in *Miller.* The California Court of Appeal correctly noted that imposing ' more strict standards on the government than are required by the Constitution would not make a statute unconstitutional. From that proposition, however, the state court then derived a decision of questionable logic: since the Supreme Court obviously intended to make it "easier" to prosecute obscenity cases after *Miller,* and since it is harder to meet the California standard of *"utterly* without redeeming social value" than it is to meet the new test of "lacks serious literary, artistic, political, or scientific value", then the state is not bound to "require increased specificity" in the law. *Enskat,* 33 Cal.App.3d at 911, 109 Cal.Rptr. at 440. This "trade-off" argument is particularly specious. First, the social value test is only one portion of the overall standard developed by the Supreme Court; isolating one portion of the test cannot cure the defects of the whole test. (It is clear that there can be "sexual activity" which is utterly without redeeming value which is so innocuous as to not be included on a list enumerated by a legislature.) Secondly, the zealous inquiry into the "intent" of the Supreme Court reveals nothing that would justify the contention that it is now supposed to be "easier" to convict purveyors of sexually-oriented materials. The Court in *Miller* set forth important First and Fifth Amendment principles central to a fair and reasoned system of criminal law, and not a statement of disapproval of works with a sexual theme.

Finally, it has been suggested that footnote 7 in United States v. 12 200-foot Reels of Film, 413 U.S. 123, 93 S. Ct. 2665, 37 L.Ed.2d 500 (1973) permits the type of construction urged upon the

court today. If the Supreme Court by that passing reference was announcing new boundaries for the legislative and judicial domains, it is clear that it at best applies only to the particular power the Supreme Court has to construe federal statutes. Without more, that narrow statement can be of no relevance to this determination. For the example of another court unwilling to construe this footnote as an invitation to repose legislative power in the judiciary, see the opinion of the Louisiana Supreme Court in Louisiana v. Shreveport News Agency, Inc., 287 So.2d 464 (1974).

In summary, we find (1) the California obscenity statute as written does not meet the specificity test of *Miller* and (2) the California courts, in interpreting the statute may have liberalized it beyond its wording but have not specifically construed it so as to give fair notice as to what is constitutionally prohibited.[2]

### *Injunctive Relief*

In addition to the prayer for declaratory relief regarding the constitutionality of the statute, plaintiffs seek injunctive relief requiring the return of their seized property. In *Steffel* the Court held that requests for injunctive and declaratory relief must not be treated as a single issue.

Since there are no allegations that criminal prosecutions are pending or threatened, plaintiffs have not asked this court to stay any state criminal actions. It was that sort of injunctive relief with which the Supreme Court was faced when formulating rules of abstention in Younger v. Harris, *supra*, Samuels v. Mackell, *supra*, and Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed. 2d 701 (1971).

Plaintiffs here merely seek the return of their seized property. Although equitable in nature, that relief is markedly different from an order which would force a state criminal court to stay its proceedings. While requiring the state to return four copies of the film and approximately $5,000 in gate receipts might have some disruptive influence on a possible future prosecution, or upon prosecutions of others, it is less harsh an interference than a direct injunction against a state proceeding. Nevertheless, for purposes of this analysis, this court will treat this prayer for injunctive relief as any other.

Cases of this sort can often involve dual requests for both injunctive and declaratory relief. See, for example, Perez v. Ledesma, *supra* (separate opinion of Brennan, J.). Younger v. Harris addressed itself solely to a rule for injunctive relief when a prosecution was pending. In Samuels v. Mackell, plaintiffs sought declaratory relief when a prosecution was similarly pending. The recent case of Steffel v. Thompson, *supra*, formulated standards for declaratory relief when no prosecution was pending, but specifically declined to rule on whether injunctive relief is appropriate in such an instance. *Id.* 415 U.S. at 462, 94 S.Ct. 1209. This court is now faced with that situation in which the Supreme Court has yet to act.

---

2. This finding comports with the following decisions which have held the statutes in other states not to comply with the mandate of *Miller:*

*New Jersey*
Hamar Theaters, Inc. v. Cryan, 365 F. Supp. 1312 (D.N.J.1973).

*Massachusetts*
Commonwealth v. Horton, 310 N.E.2d 316 (Mass.1974); Commonwealth v. Capri Enterprises, Inc., 310 N.E.2d 326 (Mass.1974); and Essex Theatre Corp. v. Police Commissioner of Boston, 310 N.E.2d 329 (Mass. 1974).

*Louisiana*
Louisiana v. Shreveport News Agency, Inc., 287 So.2d 464 (La.1974).

*Iowa*
State v. Cahill and Wedelstadt (No. IM2–261), District Court, Linn County, Iowa (August 13, 1973).

*North Carolina*
State v. Bracken (72 CR 26502) and State v. Cox (72 CR 26503), Superior Court in Greensboro, North Carolina.

*Indiana*
Stroud v. Indiana, 300 N.E.2d 100 (570S-107) (Ind.1973) and Mohney v. Indiana, 300 N.E.2d 66 (471S94) (Ind.1973).

The perimeters of such a rule of law are still unclear; whether the strict doctrine of *Younger* would apply or not when there is no pending prosecution has been seriously questioned. See Note, Implications of the *Younger* Cases for the Availability of Federal Equitable Relief When No State Prosecution Is Pending, 72 Colum.L.Rev. 874 (1972) at 895 and cases collected therein. At least one court has indicated that federal relief is more appropriate when, as here, the state statute is attacked on its face. Jones v. Wade, 479 F.2d 1176 (5th Cir. 1973) (Wisdom, J.).

Those questions, however, are of only minor importance to this court, since all the elements necessary for injunctive relief under *Younger* are present here. First, the question of whether these plaintiffs have standing and present a justiciable controversy has already been discussed. This court need only reiterate that defendants are now holding a significant amount of money in which plaintiffs claim a present property right. Second, the posture of § 311 as construed by the California courts is such that it is unlikely the injury could be remedied by a defense in a criminal prosecution. The admonition of abstention in Younger v. Harris must be viewed in light of the fact that the statute involved there (the California Syndicalism Act) had never been reviewed by the state courts since the Supreme Court had overruled Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) by its decision in Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L. Ed.2d 430 (1969). A defendant then faced with a prosecution for violating that Act could have set up a defense based upon the unconstitutionality of the statute.

By way of contrast, the California obscenity decision has been finally reviewed in the light of United States v. Miller. The construction of § 311 rendered in *Enskat* has effectively foreclosed relief in the state courts.

Finally, the objective facts set forth in the first part of this opinion clearly demonstrate bad faith and harassment which would justify federal intervention. Any editorializing of those facts would serve no purpose. It is sufficient to note that the pattern of seizures of the plaintiffs' cash receipts and films demonstrate that the police were bent upon a course of action that, regardless of the nature of any judicial proceeding, would effectively exorcise the movie "Deep Throat" out of Buena Park.

The gravamen of the defendants' justification is, of course, that the property is contraband, both the evidence and the fruit of an illegal activity. Such a justification, however, dissipates in the face of a declaration by this court that the statute is invalid.

Pursuant to the provisions of Rule 52(a) this opinion shall constitute the findings of fact and conclusions of law of the court.

Pursuant to the provisions of Rule 58 a separate judgment shall be prepared and entered which shall provide as follows:

1. The California obscenity statute, Penal Code Sections 311 et seq., are in violation of the mandate of the United States Supreme Court as set forth in Miller v. California, 413 U.S. 15, 93 S. Ct. 2607, 37 L.Ed.2d 419 (1973).

2. The defendants shall return to the plaintiffs the property seized from the plaintiffs on November 23 and 24, 1973, in the City of Buena Park, California.

3. The court retains full and complete jurisdiction over the parties and the causes of action for all purposes.

4. Plaintiffs are entitled to their costs.

### SUPPLEMENTAL MEMORANDUM OPINION

The defendants have filed appropriate motions to amend the judgment in this case which was filed June 4, 1974.

They allege that: (1) this court was factually in error when it held that the plaintiffs were not defendants in a criminal prosecution; (2) the judgment is contrary to the holding of the Supreme

Court in Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); and (3) the injunctive part of the judgment should be modified because (a) the money seized has been returned to the plaintiffs and (b) the films are under the custody of the Municipal Court which is not a party to these proceedings.

## I

The first issue is one of serious consequence, for it goes to the heart of the court's reasoning on the issue of abstention. The court bottomed its decision on the abstention issue on the fact that no criminal proceedings had been instituted in state court against the plaintiffs by the date on which they filed their complaint in this court.

The evidence submitted by the defendants here reveals the following:

1. On the date of the filing of the complaint in this case, November 29, 1973, there was pending in the state municipal court an 8-count misdemeanor complaint against Edward Lee Bailey and James Samuel Lytell in connection with the exhibition of "Deep Throat" in Buena Park.

2. Copies of that complaint were furnished this court on December 3, 1973.

3. Neither Mr. Bailey nor Mr. Lytell are parties to this action.

4. The complaint in this action was served upon the District Attorney of Orange County by a deputy United States marshal on January 14, 1974; the other defendants had been served a few days before.

5. On January 15, 1974, a day after that service, the criminal complaint in the state municipal court was amended by the District Attorney of Orange County to include Vincent Miranda and Walnut Properties, Inc., plaintiffs in this action.

6. The defendants rely on the amended state criminal complaint and urge abstention.

The operation of the abstention doctrine when criminal charges are pending is outlined in a trilogy of cases decided in 1971: Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); and Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). In each of those cases, a criminal indictment or information had been filed against the plaintiff *before* a complaint was filed in the federal district court. When no criminal charge is pending, however, the case is governed by the doctrine of Steffel v. Thompson, 415 U. S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). There, the Court noted:

> When no state criminal proceeding is pending at the time the federal complaint is *filed*, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system . . . .
> 415 U.S. at 462, 94 S.Ct. at 1217 (emphasis added)

It is clear that for purposes of the abstention doctrine, a determination of whether there is an "ongoing state criminal prosecution" against the plaintiff is measured as of the time of the filing of the complaint in federal court. The fact that the defendants filed criminal charges against the plaintiff after the instant case was under consideration does not alter this court's duty to decide the controversy before it.

Furthermore, the later criminal charges would seem to supply added justification for action by the court. The Chief Justice, in a recent and extensive separate opinion, commented about the burdens and possible ramifications of Younger v. Harris. See Allee v. Medrano, 416 U.S. 802, 94 S.Ct. 2191, 40 L. Ed.2d 566 (1974) (Burger, C. J., concurring in part and dissenting in part.) He there noted that inferences of bad faith can arise from the common activity of the prosecutors and the police, inferences that the state may have had reasons for bringing a prosecution other than an expectation of securing a valid conviction. While the strict requirements of *Younger* are only of tangential

relevance to the prior opinion of this court, the evidence brought to light by the petition for rehearing only serves to strengthen the previous finding of bad faith and harassment. Reasonable people could certainly infer prosecutorial misconduct from the course of action revealed in the latest petition.

■ No explanation is given why criminal charges were not instituted against the plaintiffs here until after the filing and service of the complaint in this action. Without such an explanation it is reasonable for the court to conclude that the institution of the criminal proceedings was in retaliation for the attempt by plaintiffs to have their constitutional rights judicially determined in this court. That conclusion surely removes this case from the abstention doctrine of *Younger* and *Mackell*.

## II

■ Defendants have requested that this court reconsider its holding in light of the recent decision of the Supreme Court in Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). There, the Court upheld the constitutionality of a *federal* statute which prohibits the mailing of obscene matter, holding that the statutory language as construed met the specificity test of Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). More exactly, Justice Rehnquist referred to footnote 7 of United States v. 12 200-ft. Reels of Film, 413 U.S. 123, 130, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973) as authority for the construction the Court offered in *Hamling*; i. e., that the terms "obscene", etc., include the specific "hard-core" matter as described in *Miller* at 25, 93 S.Ct. at 2615:

"(a) Patently offensive representations or descriptions of ultimate sex acts, normal or perverted, actual or simulated.

(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals."

See 418 U.S. at 114, 94 S.Ct. 2887. That such a construction would be possible was noted by this court in its original opinion; there is nothing in Hamling v. United States to suggest that the Supreme Court there did anything more than exercise its authority to construe federal statutes, an authority alluded to in that same footnote 7 of *12 200-ft. Reels*. See United States v. Thirty-seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); compare the dissenting opinion of Black, J., *id.* at 384, 91 S.Ct. 1418.

More importantly, there is nothing in *Hamling* which would lead this court to believe that the specificity requirements of *Miller* have been overruled. The tenets of *Miller* have not been met, either by the California statute on its face or as construed, either pre-*Miller* or in *Enskat*. There has been no construction by the California courts of an obscenity standard based upon specific acts, nor any formulation comparable to that added to the federal statute in *Hamling*. The Supreme Court in *Hamling*, in fact, points out in detail the infirmity of *Enskat*. In *Hamling* the Court set forth with regard to the federal statute a specific jury instruction which meets the specificity test of *Miller*. However, no such specific instruction is found in *Enskat*, nor can one be inferred. Nothing in that opinion contains language from which an instruction to a jury could be drawn as to what specific conduct may be constitutionally proscribed.

This court is also faced with the recent dismissal by the Supreme Court of Miller v. California, 418 U.S. 915, 94 S. Ct. 3206, 41 L.Ed.2d 1158 (1974) (Miller II), "for want of a substantial federal question." When Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (Miller I) was decided in the 1973 term of the Court, the case itself was remanded to the state courts in light of the new obscenity standards developed therein. Upon remand, the case was reaffirmed by the Appellate Department of the California Superior Court of Orange County with the following notation: "affirmed, Peo-

ple v. Enskat (1973), 33 Cal.App.3d 900, 109 Cal.Rptr. 433". People v. Enskat was docketed with the Supreme Court sub nom. Enskat v. California; the writ of certiorari in that discretionary appeal was denied. 418 U.S. 915, 94 S.Ct. 3206 (1974).

*Enskat* is the case discussed and analyzed in the original opinion in this case. The denial of the writ of certiorari in that case does not operate as a decision on the merits. See Polites v. United States, 364 U.S. 426, 433 n. 9, 81 S.Ct. 202, 5 L.Ed.2d 173 (1960); United States v. Shubert, 348 U.S. 222, 228 n. 10, 75 S.Ct. 277, 99 L.Ed. 279 (1955). The appeal in *Miller,* however, was taken under 28 U.S.C. § 1257(2) as an appeal of right. This court must now ascertain whether the summary action in Miller II operates as a decision on the merits of the challenge to the constitutionality of the California obscenity statute.

The question is one which has led to commentary by many of this country's preeminent .Federal Jurisdiction and Constitutional Law scholars. Professor Bickel would characterize a dismissal for lack of a substantial federal question as a refusal by the Court to exercise its jurisdiction; a reflection of pragmatic considerations and institutional expediency, but not necessarily a decision on the merits. A. Bickel, The Least Dangerous Branch (1962). Professor Wechsler, however, feels that the Court should not have the option to decide or reject those cases before it on appeal as of right. H. Wechsler, Towards Neutral Principles of Constitutional Law (1961). Professor Gunther sides with the anti-discretion forces, terming those instances in which the Court has clearly ducked a substantial federal question as "aberrations." Gunther, The Subtle Vice of the "Passive Virtues"—A Comment on Principle and Expediency in Judicial Review, 64 Colum.L.Rev. 1, 12 (1964).

Defendants have mistakenly asserted that Justice Brennan's separate opinion in Ohio ex rel. Eaton v. Price, 360 U.S. 246, 79 S.Ct. 978, 3 L.Ed.2d 1200 (1959) forecloses the question and definitely es-

tablishes that such a dismissal is on the merits. Justice Brennan was not there speaking for the Court, which itself had done no more than note probable jurisdiction of the case on the basis of a 4–4 vote. Rather, he was expressing his personal displeasure at the decision of four of his colleagues to make known the reason for their votes against noting jurisdiction. His statements were, therefore, no more than one justice's passing comments on an issue not before the Court.

It should be noted tangentially that quite a different issue arises when, after deliberation, the Court affirms a decision below by a 4–4 vote, as happened after oral argument in the *Eaton* case. 364 U.S. 263, 80 S.Ct. 1463, 4 L.Ed.2d 1708 (1960). Because of lack of agreement by a majority of the Court, many people, including Justice Brennan, feel that such affirmances, while binding on the parties, have no value as precedent. See 364 U.S. at 264, 80 S.Ct. 1463; United States v. Pink, 315 U.S. 203, 216, 62 S.Ct. 552, 86 L.Ed. 796 (1942); Hertz v. Woodman, 218 U.S. 205, 212–214, 30 S.Ct. 621, 54 L.Ed. 1001 (1910).

Thus this court can do no more than take note of Justice Brennan's statement on the dismissal question, and perhaps contrast it with the apparent thrust of Justice Harlan's dissent in Redrup v. New York, 386 U.S. 767, 771 (1967) at 772, 87 S.Ct. 1414, 18 L.Ed.2d 515, in which he seemed to embrace the Bickel view and equate dismissal of a writ of certiorari as improvidently granted with a dismissal of an appeal for want of a substantial federal question. More recently, Justice Rehnquist, writing for the Court in Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 1359–1360, 39 L.Ed.2d 662 (1974), suggested that a summary affirmance would carry less weight as precedent than a written affirmance after deliberation. See Jordan v. Gilligan, 500 F.2d 701 (7th Cir. 1973).

The courts in several circuits have been confronted with the problem: see, for example, Ahern v. Murphy, 457 F.2d

363 (7th Cir. 1972); Hall v. Thornton, 445 F.2d 834 (4th Cir. 1971); Heaney v. Allen, 425 F.2d 869 (2nd Cir. 1970); Cross v. Bruning, 413 F.2d 678 (9th Cir. 1969); Port Authority Bondholders Protection Committee v. Port of New York Authority, 387 F.2d 259 (2nd Cir. 1967). Uniformly those courts have held that they will not themselves hear a question the Supreme Court has previously branded as "insubstantial." Two of these courts relied in part on Justice Brennan's opinion in *Eaton,* supra, giving it what this court has discussed above as erroneous precedential value. See 457 F.2d at 364; 445 F.2d at 835. A widely cited student law review article, however, has criticized the *Port Authority* decision, pointing out that the phrase "want of a substantial federal question" can have several meanings, not all of which should foreclose another federal court from exercising jurisdiction: "Where the Court was presented for the first time with a non-frivolous federal claim, and dismissed it summarily, it would be excessively harsh to hold that no lower federal court could thenceforth rule in favor of the argument advanced." Comment, The Significance of Dismissals "For Want of a Substantial Federal Question": Original Sin in the Federal Courts, 68 Colum.L.Rev. 785, 791 (1968).

The highly speculative nature of lower court pronouncements about the import of Supreme Court summary procedures is made evident even in Judge Friendly's opinion in *Port Authority,* 387 F.2d at 262 n. 3; therefore it seems to this court safe to say that there is at least equal merit in a position opposite to that taken in the cases discussed above.

▮ It is apparent that only the Supreme Court itself can resolve the dilemma. When this court considered the problem of the constitutionality of the California obscenity statute and the construction rendered by the state court in *Enskat,* there was certainly a substantial federal question presented. Since the summary treatment of Miller II upon remand is inextricably tied to *Enskat,* a case in which there was merely a denial of certiorari, this court cannot attach plenary precedential value to the summary treatment. There have been no doctrinal changes in the time between the original decision here and this petition for rehearing which should alter the previous determination.

## III

All parties concede that the money seized from the theater has now been returned, and therefore it is proper that that requirement be eliminated from the judgment of June 4, 1974.

With reference to the return of the four films, the evidence presented to this court shows the following:

1. On January 29, 1974 at pre-trial hearings in the state municipal court, the Assistant District Attorney of Orange County stipulated that all four of the prints seized were identical. That stipulation was accepted by defense counsel. The court stated "the stipulation will be received."

2. The Assistant District Attorney stated that "Well, I think we're trying to resolve the problem in a practical fashion, Your Honor—It's not our desire to have to show more than one of those films at the time of trial if we can avoid it."

3. Plaintiffs' counsel have stated that they wish to honor that stipulation and therefore do not oppose the state officials' retaining one copy of the film.

Technically the defendants may be correct in saying that they have no power to return the film since it is in the custody of the Municipal Court. However, there was apparently little or no difficulty encountered by anyone involved in returning to the plaintiffs their money. At the January 29th proceeding in the Municipal Court, the Assistant District Attorney stipulated with defense counsel that the money would be returned to the plaintiffs here on their agreement that the police could make copies of the bills and cash and that the copies could then be admitted at trial.

The Municipal Court judge agreed that "the stipulation will be received as stated." The money was thereupon returned.

 It appears that there should be no difficulty whatsoever in following a similar approach in returning three of the films to the plaintiffs. If that transaction will require petitioning the state court to release the films, the burden is upon the defendants to so petition.

Paragraph *two* of the judgment of this court will be amended to read as follows:

2. The defendants shall in good faith petition the Municipal Court of the North Orange County Judicial District to return to the plaintiffs three of the four film prints seized from the plaintiffs on November 23 and 24, 1973 in the City of Buena Park.

Except as the judgment will be so modified, the motions of the defendants are denied.